# IN THE SUPREME COURT OF IOWA

No. 23–0572

Submitted October 11, 2023—Filed April 12, 2024

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**REUBEN ANDREW NEFF,**

Appellant.

---

On appeal from the report and recommendation of the Iowa Supreme Court Grievance Commission.

In an attorney disciplinary action, the grievance commission recommends suspension of an attorney's license for violation of an ethical rule prohibiting sexual harassment. **ATTORNEY REPRIMANDED.**

McDonald, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., and Mansfield, J., took no part in the decision of the case.

Matthew G. Sease (argued) and Delaney J. Kozlowski of Sease & Wadding, Des Moines, for appellant.

Tara van Brederode, Robert A. Howard, III (argued), and Alexis W. Grove, Des Moines, for appellee.

**MCDONALD, Justice.**

Wapello County Attorney Reuben Neff made inappropriate statements at work. The Iowa Supreme Court Attorney Disciplinary Board was made aware of these statements and charged Neff with violating Iowa Rule of Professional Conduct 32:8.4(g), which provides it is professional misconduct for a lawyer to "engage in sexual harassment or other unlawful discrimination in the practice of law." Based on a stipulated record, the grievance commission found Neff violated rule 32:8.4(g) and recommended his license be suspended for sixty days. Neff filed this appeal. In this appeal, Neff argues the Board failed to prove a violation of the rule. If the Board proved a violation of the rule, Neff contends, the rule violates the United States Constitution's First Amendment right to free speech as applied to the facts of this case and on its face. Finally, Neff argues, if the board proved a violation of the rule and the rule is constitutional, the grievance commission's recommended sanction is too severe. We conclude the Board proved a violation of the rule, the rule is constitutional as applied and on its face, and Neff should be reprimanded.

I.

The case was submitted to the grievance commission on a stipulated record. The stipulated record shows the following. Neff was admitted to practice law in Florida in 2011 and in Iowa in 2017. He was elected to serve as the Wapello County Attorney in 2018 and served in that position at all times relevant to this proceeding. The Wapello County Attorney's Office employed ten individuals. Among those ten were five attorneys and five administrative staff. Nine of the ten employees were women. One of those nine women identified as a member of the LGBTQ+ community. Although this attorney disciplinary proceeding involves Neff's inappropriate workplace statements, Neff's staff "believe[d] that the office dynamics [were] the best that they have been in a number of years and prefer[ed] [Neff's] leadership over the leadership of the two prior county attorneys."

Neff made at least nine comments that are at issue in this disciplinary proceeding. At least some of his comments were made in front of his employees Tanvi Yenna and Carly Schoemaker. Three of Neff's comments related to defendants in criminal cases pending at the county attorney's office. While prosecuting a criminal defendant, Neff told Yenna that a criminal defendant's "asshole" would be "this big" by the time the criminal defendant left prison. Neff formed a circular shape with his hands when he made the statement. Another time, while prosecuting a case involving sexual exploitation of a minor, Neff told Yenna that the defendant should "lube up" and "grab his ankles." After losing a criminal sex abuse case, Neff told Yenna and Schoemaker that he wished the defendant would be "raped by antelopes and mauled by lions at the same time."

Neff also made inappropriate comments about judges. Neff "occasionally" referred to judges as "bitches" following an unfavorable decision. Neff once referred to a particular judge as a "limp dick" because Neff was frustrated about how the judge presided over a sexual assault trial in which the defendant was acquitted.

Finally, Neff told several off-color stories and jokes in the workplace. While discussing false accusations in criminal cases, Neff relayed to Yenna and Schoemaker that he was falsely accused of sexual assault in college. In the fall of 2019 or spring of 2020, Neff told Yenna and Schoemaker about a college memory in which another student came to class wearing pajamas and no shirt. The student's penis fell out of his pajama pants, and the professor yelled at the student that he "[did] not care how proud he was of his size, get out." Sometime in early 2020, Neff made a joke. Upon arriving late to the office after snow-blowing his driveway, Neff remarked that he spent the morning blowing five inches, though he did not believe his wife minded. In response to a staff member's smirk, Neff quipped, "[T]hat's what she said." This statement was a

quotation from a running joke made on the TV show "The Office." Yenna and Schoemaker frequently used the quote in the workplace.

The final statement relates to a telephone call Neff received from a member of the public. Neff related to Yenna that the caller referred to Neff's predecessor as a "faggot." After Yenna objected to Neff's use of the word, Neff asserted his ability to say the word by repeating the epithet. Neff used this epithet knowing that Yenna identified as part of the LGBTQ+ community.

The Wapello County Attorney's Office has a policy that prohibits sexual harassment and retaliation against reporters of sexual harassment. Under the policy, an employee can file a complaint with the county auditor, the county attorney, or the county board of supervisors. Staff members were aware of the policy. Yenna availed herself of the policy on a prior occasion and filed a complaint against a female employee in the office.

No employee ever filed a complaint against Neff for violating the sexual harassment policy, but Neff conceded Yenna informed him that his comments in the workplace were inappropriate. The parties stipulated that Neff had attempted, not always successfully, to address these issues. The parties stipulated that Yenna and Schoemaker left their employment with the Wapello County Attorney's Office, in part, due to Neff's comments.

Based on this stipulated record, the grievance commission found the Board proved a violation of Iowa Rule of Professional Conduct 32:8.4(g). In determining the appropriate sanction, the commission identified several aggravating factors: Neff was an elected official, he held power over those in his office, and his actions, in part, caused others to leave their employment. The commission also found several mitigating factors: Neff's cooperation with the disciplinary process, his lack of prior discipline, his dedication to public and community service, and his favorable character references. The commission

recommended Neff's license be suspended for sixty days. Neff timely filed this appeal.

II.

"Avoidance of constitutional issues except when necessary for proper disposition of [a] controversy is a bulwark of American jurisprudence." *Salsbury Lab'ys. v. Iowa Dep't of Env't Quality*, 276 N.W.2d 830, 837 (Iowa 1979); *see LSCP, LLLP v. Kay-Decker*, 861 N.W.2d 846, 867 (Iowa 2015) ("[C]ourts have a duty to avoid constitutional questions when [the] merits of a case may be fairly decided without facing such questions." (alterations in original) (quoting *Moorman Mfg. Co. v. Bair*, 254 N.W.2d 737, 749 (Iowa 1977) (en banc))). Thus, while Neff raises a constitutional challenge to rule 32:8.4(g), we begin with Neff's contention that the Board failed to prove a violation of the rule. If the Board failed to prove a violation of the rule, then we need not address Neff's constitutional challenge to the rule.

"We review attorney disciplinary proceedings de novo." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Stansberry*, 922 N.W.2d 591, 593 (Iowa 2019). "The Board has the burden of proving ethical misconduct of the attorney by a convincing preponderance of the evidence." *Id.* This burden is greater than the preponderance standard required in civil cases but less than the reasonable doubt standard in criminal cases. *Id.* Where the parties stipulate to the facts, we review them "with reference to their subject matter and in light of the surrounding circumstances and the whole record." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Nine*, 920 N.W.2d 825, 828 (Iowa 2018) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Johnson*, 884 N.W.2d 772, 777 (Iowa 2016)).

Iowa Rule of Professional Conduct 32:8.4(g) provides that "[i]t is professional misconduct for a lawyer to . . . engage in sexual harassment or other unlawful discrimination in the practice of law or knowingly permit staff or agents subject to the lawyer's direction and control to do so." The rule applies outside

the attorney–client relationship. The text of the rule "makes it clear that the rule may be violated even if there is no attorney–client relationship between the lawyer and the person subject to sexual harassment, as long as the attorney is engaged in the practice of law." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 603 (Iowa 2015). The rule "may be violated if a lawyer sexually harasses witnesses, court personnel, law partners, law-office employees, or other third parties that come into contact with a lawyer engaged in the practice of law." *Id.*

Sexual harassment as used in the rule includes "sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature" that have no legitimate place in the practice of law. *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 124 (Iowa 1999) (en banc) (quoting *Sexual Harassment, Black's Law Dictionary* 1375 (6th ed. 1990)); *accord Iowa Sup. Ct. Att'y Disciplinary Bd. v. Newport*, 955 N.W.2d 176, 182 (Iowa 2021); *Moothart*, 860 N.W.2d at 604. Our cases have discussed distinct types of sexual harassment. One category involves "come-ons." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Watkins*, 944 N.W.2d 881, 887 (Iowa 2020). These include "any physical or verbal act of a sexual nature that has no legitimate place in a legal setting." *Id.* (quoting *Stansberry*, 922 N.W.2d at 597). More recently, this court stated that sexual harassment also includes sex-based put-downs. *See id.* at 887–88. Examples include " 'woman bashing' jokes, insults about [women's] incompetence, the irrelevance or sexual unattractiveness of older women, and comments that women have no place in certain kinds of jobs . . . referring to women by degraded names for body parts, pornographic images, [and] crude comments about female sexuality or sexual activity." *Id.* (alterations in original) (citation omitted) (quoting Louise F. Fitzgerald & Lilia M. Cortina, *Sexual Harassment in Work Organizations: A View From the Twenty-First Century*, in 1 *APA Handbook of Psychology of Women* 7 (Cheryl B. Travis & Jacquelyn W.

White, eds., 2018)). This form of harassment "does not require an individual woman to serve as its target or unwanted sexual overtures, nor does it need to be explicitly linked to any job or consideration." *Id.*

This court has applied rule 32:8.4(g) in a variety of circumstances. In *Iowa Supreme Court Board of Professional Ethics v. Steffes*, an attorney "took photographs of his partially-clothed client under the pretext of documenting her back injury." 588 N.W.2d at 122. Steffes told the client that they should take pictures of her "back so they could be used to demonstrate to the jury where her pain was." *Id.* While in his office, Steffes convinced the client to expose her back and unhook her bra. *Id.* at 123. While the client was in a state of partial undress, "Steffes walked over to her and pulled her shorts and underwear down to her knees, and then stepped back to take the pictures." *Id.* He said the pictures would be helpful because the client had a "nice body." *Id.* We had little trouble concluding that Steffes violated the rule. We reasoned that "Steffes's act of photographing his partially-clothed client under the pretext that the photographs would document her back injury and/or favorably impress male jurors in her criminal trial constitutes physical conduct of a sexual nature." *Id.* at 124–25. Given that there was "no relationship between the *frontal* photograph showing his client's exposed breasts and pubic area, and a purported documentation of her *back* injury," we concluded that "the photographs were sexual in nature, taken to satisfy Steffes's own prurient interests" and so constituted sexual harassment. *Id.* at 125. We suspended Steffes's license for two years. *Id.*

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Furlong*, we suspended an attorney's license for eighteen months for inappropriate conduct with two clients. 625 N.W.2d 711, 713–14 (Iowa 2001) (en banc). With respect to the first client, on the day her dissolution decree was final, the attorney gave her "an uninvited kiss while they were at the courthouse during which he

inserted his tongue into her mouth." *Id.* at 712. Later that day, at the attorney's office, the attorney told the client that "she was beautiful, placed his hand inside her underclothing, and digitally penetrated her vagina." *Id.* The lawyer later had sex with the client. *Id.* We concluded this violated the rule prohibiting lawyers from having sexual relationships with clients. *Id.* at 713. The second client testified that when she was in the lawyer's "office he perpetually ogled her and would attempt to rub her back and shoulders while calling her a 'pretty little thing.'" *Id.* at 712. She also testified the lawyer "placed his hands on her back and shoulders." *Id.* We found this conduct violated the rule against sexual harassment. *Id.* at 713.

In *Iowa Supreme Court Attorney Disciplinary Board v. Moothart*, we suspended an attorney for thirty months for, among other things, sexual harassment of four female clients. 860 N.W.2d at 618. The attorney plied a twenty-two-year-old client with alcoholic drinks to the point of her intoxication, convinced her to expose her breasts, and then sat on a couch with her in a dark room in a sexually provocative position while making sexual suggestions. *Id.* at 608. We explained Moothart could not escape culpability on the ground the client "did not expressly object" to Moothart's sexual advances. *Id.* at 609. The attorney kissed the second client, did other "stuff" with her in a courthouse conference room, and later had sex with her. *Id.* We concluded this "unwanted sexual contact" constituted sexual harassment. *Id.* at 611. Moothart engaged in similar conduct with respect to a third client. *Id.* at 612. He commented on her breasts, successfully requested she flash her breasts to him, and had her perform oral sex on him in exchange for $100. *Id.* at 612–13. We concluded this conduct constituted sexual advances, requests for sexual favors, and other physical conduct of a sexual nature in violation of the rule. *Id.* at 613. The attorney subjected a fourth client to explicit quid pro quo sexual harassment. *Id.* He asked

this client to pull her shirt down and explained that the cost of services would depend on how much cleavage the client exposed. *Id.*

This attorney also committed workplace sexual harassment with respect to his legal secretary. *Id.* at 614. She testified Moothart "comment[ed] about her weight and how her body looked in different outfits, about her breasts, and about other aspects of her body" and "also asked her to perform lap dances and taped a $20 bill to the back of a cabinet door and said she was free to take it if she danced naked on the conference room table." *Id.* He also grabbed her breast, told her they should order a sex toy for use while having sex, looked up her skirt and commented on her underwear, and regularly made "comments about female clients' breasts." *Id.* We concluded Moothart violated rule 32:8.4(g) by "injecting sexual commentary into the workplace." *Id.*

The attorney in *Iowa Supreme Court Attorney Disciplinary Board v. Stansberry* committed severe invasions of his female colleagues' privacy for the sake of his own sexual gratification. 922 N.W.2d at 593. Specifically, "[t]he attorney stole a woman colleague's underpants from her home, rifled through and photographed her undergarments in her bedroom, and rifled through female colleagues' gym bags at the office to photograph their undergarments, all for his personal sexual gratification." *Id.* We concluded that "taking photographs of their intimate items and stealing underpants for his own sexual gratification" violated rule 32:8.4(g). *Id.* at 597. We suspended the attorney's license for one year. *Id.* at 601.

*Iowa Supreme Court Attorney Disciplinary Board v. Watkins* involved the conduct of an elected county attorney in the workplace. 944 N.W.2d at 884. Watkins's behavior "virtually ran the whole gamut" of putdowns, come-ons, degrading comments, and conduct and statements of a sexual nature. *Id.* at 888. He appeared in front of his staff in his boxer briefs. *Id.* at 885. He kept a nude image of his wife on his computer. *Id.* at 885–86. He showed a picture of his

wife's vagina, which he kept on his cell phone, and showed a video of his wife squirting breast milk. *Id.* He made statements about sex in the workplace, including stating that he just wished he had a wife who had sex with him all the time. *Id.* at 888. He commented on women's bodies, stating he would not want to see one woman naked, stating that he wanted to know whether a courthouse employee wore a padded bra or had really big boobs, and told an employee that her "boobs [were] distracting him." *Id.* at 885 (alteration in original). He asked the same employee whether "her vagina was still broke" after she missed work for a gynecology appointment. *Id.* He also referred to a local attorney as "T. Queef," a term which describes the emission of air from the vagina. *Id.* We noted that in a different proceeding to remove Watkins from office, the district court found "Watkins's inappropriate conduct was pervasive and existed over a significant period of time." *Id.* at 886. We concluded Watkins's inappropriate, pervasive, and explicit sexual conduct violated rule 32:8.4(g) and suspended his license for six months. *Id.* at 894.

Most recently, in *Iowa Supreme Court Attorney Disciplinary Board v. Newport*, we concluded that an attorney sexually harassed two clients. 955 N.W.2d at 182. Among other things, he discussed a medical procedure that made it difficult to get an erection, and he discussed the color of his pubic hair. *Id.* at 179. After reaching a settlement in the case, Newport said to one client over the phone, "Deal's done, drop your clothes off, and you can give me a blow job." *Id.* With respect to the second client, Newport proposed a quid pro quo sexual arrangement for his legal services. *Id.* at 181. We found that "Newport made repeated, harassing comments of a sexual nature." *Id.* at 183 n.5. We suspended his license for one year. *See id.* at 186.

We have little trouble concluding the Board proved Neff violated rule 32:8.4(g) as interpreted and applied in these precedents. This case is most similar to *Watkins*. As in *Watkins*, Neff interjected comments of a sexual nature

into the workplace. He made hyperbolic statements wishing prison rape and animal rape on criminal defendants. Those statements had no "legitimate place in a legal setting." *Stansberry*, 922 N.W.2d at 597 (quoting *Moothart*, 860 N.W.2d at 604). Neff's statements regarding criminal defendants were particularly egregious because a prosecutor's duty is "to do justice, not only for the accusers, but also for the accused." *State v. Iowa Dist. Ct.*, 568 N.W.2d 505, 508 (Iowa 1997) (en banc). Wishing violence, harm, and rape on the criminally accused was contrary to Neff's duties as a law enforcement officer. In addition to wishing sexual violence against accused persons, Neff sex-stereotyped judges with whom he disagreed. He "occasionally" called some judges "bitches," and he called a male judge a "limp dick." Neff told inappropriate stories about a man's penis falling out of his pajamas. He made jokes with sexual innuendo. He used the word "faggot" in a conversation with Yenna and repeated the word to her face after her objection. *See, e.g.*, *People v. Abrams*, 459 P.3d 1228, 1239–41 (Colo. O.P.D.J. 2020) (holding that use of the words "faggot" and "homo" were in violation of a similar provision of Colorado's rules). Neff's employees informed him of the impropriety of his statements, but he was not successful in changing his conduct. Two of Neff's employees resigned their employment with the county attorney's office due, in part, to Neff's statements and conduct in the workplace.

We cannot say that any one of these statements, standing alone, would be sufficient evidence to violate rule 32:8.4(g), but Neff's conduct, when taken as a whole, objectively interfered with and caused harm in the workplace. While Neff's conduct is not as severe as pervasive or as explicitly sexual as that in *Watkins*, that distinction makes this case only lesser in degree but not different in kind. We thus conclude that the Board proved Neff violated rule 32:8.4(g).

### III.

Neff contends that sanctioning him for violating rule 32:8.4(g) violates his right to free speech as protected by the First Amendment to the United States

Constitution. He makes an as-applied challenge and a facial-overbreadth challenge to the rule. "[A]n 'as applied' challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied." *Const. Party of Pa. v. Cortes*, 824 F.3d 386, 394 (3d Cir. 2016) (quoting 16 C.J.S. Constitutional Law § 243). For the reasons expressed below, we disagree with both arguments.

A.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment is applicable to the states via incorporation under the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). As the licensing authority for attorneys in this state, this court's ability to revoke, suspend, or otherwise sanction an attorney is "necessarily constrained by the First Amendment." *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Visser*, 629 N.W.2d 376, 380 (2001) (en banc) (quoting *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 108 (1990)); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Att'y Doe No. 792*, 878 N.W.2d 189, 194 (Iowa 2016) (stating in attorney disciplinary case we "analyze whether the statement is entitled to First Amendment protection"); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 80 (Iowa 2008). Yet, " '[m]embership in the bar is a privilege burdened with conditions,' to use the oft-repeated statement of [Justice] Cardozo," including First Amendment rights. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1062–63 (1991) (quoting *In re Rouss*, 116 N.E. 782, 783 (N.Y. 1917)). In that context, we "engage[] in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue." *Id.* at 1073.

B.

We first address Neff's as-applied challenge to rule 32:8.4(g). There is no doubt that preventing sexual harassment and discrimination "is not only a legitimate, but a compelling, government interest." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001). This court, as the state entity with the power to license and sanction attorneys, certainly has a compelling interest in ensuring that lawyers do not engage in sexual harassment in the practice of law. This includes the sexual harassment of clients, "witnesses, court personnel, law partners, law-office employees, or other third parties that come into contact with a lawyer engaged in the practice of law." *Moothart*, 860 N.W.2d at 603.

There is also no doubt that punishing a lawyer for sexual harassment based solely on offensive speech can create tension with the Supreme Court's First Amendment jurisprudence. Under the Supreme Court's precedents, the government does not have an interest in regulating speech solely because of its offensive content. *See Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Even where the speech actually offends a listener, punishing such speech "would be inconsistent with '[the Supreme Court's] longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience.'" *Boos v. Barry*, 485 U.S. 312, 322 (1988) (second alteration in original) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988)). "The emotive impact of speech on its audience is not a 'secondary effect'" that can be constitutionally regulated under the First Amendment. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992) (quoting *Boos*, 485 U.S. at 321). This limiting principle applies to laws prohibiting sexual harassment, including rule 32:8.4(g). "There

is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *see also DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (stating there is "no categorical rule that divests 'harassing' speech as defined by federal anti-discrimination statutes, of First Amendment protection" (quoting *Saxe*, 240 F.3d at 204)).

Courts have explored the tension between the government's interest in eliminating sexual harassment and the First Amendment right to free speech in different contexts. Title VII, prohibiting sexual harassment in the workplace, "has always had an uneasy coexistence with the First Amendment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1344 (11th Cir. 2023) (per curiam) (Brasher, J., concurring). "It is no use to deny or minimize this problem because, when Title VII is applied to sexual harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995). Justice Thomas has expressed the view that to uphold the constitutionality of content-based antidiscrimination laws, such as Title VII, the Court "would have to substantially modify [its] First Amendment jurisprudence." *Avis Rent A Car Sys., Inc. v. Aguilar*, 529 U.S. 1138, 1141 (2000) (Thomas, J., dissenting from the denial of certiorari).

In *Saxe v. State College Area School District*, then-Judge Alito explored this tension in the context of a constitutional challenge to a school's antiharassment policy that prohibited "unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because" of their protected characteristics. 240 F.3d at 202–03. "There is of course no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause. But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive

. . . ." *Id.* at 206. "When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications." *Id.* "[A] disparaging comment directed at an individual's sex . . . has the potential to create an 'hostile environment'—and thus come within the ambit of anti-discrimination laws—precisely because of its sensitive subject matter and because of the odious viewpoint it expresses." *Id.* Then-Judge Alito rejected the district court's view that " 'harassment'—at least when it consists of speech targeted solely on the basis of its expressive content—'has never been considered to be protected activity under the First Amendment.' " *Id.* at 209. He concluded that "[s]uch a categorical rule is without precedent in the decisions of the Supreme Court . . . , and it belies the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech." *Id.*

Although there is a tension between this court's interest in prohibiting sexual harassment in the practice of law where the alleged harassment consists solely of expressive speech and an attorney's right to free speech as protected under current First Amendment doctrine, that tension is not insoluble. We think the constitutional protection afforded speech can be satisfied in the attorney disciplinary context by requiring a showing the nonexpressive impact of the speech resulted in objective harm beyond mere "adverse emotional impact on the audience." *Boos*, 485 U.S. at 322 (quoting *Hustler Mag.*, 485 U.S. at 55). Objective harm is measured from the viewpoint of a reasonable person and not based on mere subjective offense of the listener. This court has incorporated a similar standard into other disciplinary rules regulating attorney speech. *See, e.g.*, *Attorney Doe No. 792*, 878 N.W.2d at 194 (explaining that to avoid constitutional concerns we adopted "an objective standard for assessing criticisms of judicial officers made by attorneys"); *Weaver*, 750 N.W.2d at 82 (applying "an objective standard in cases involving criticism of judicial officers");

*Visser,* 629 N.W.2d at 382 (requiring an objective determination that statements were "reasonably likely to affect the fairness of the proceedings"). And we think a similar standard is inherent in rule 32:8.4(g).

The requirement that there be an objective assessment of harm is "designed to play a crucial, mediating role in the effort to accommodate equality and dignitary interests without trampling on free speech values." Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark,* 1994 Sup. Ct. Rev. 1, 44 (1994). The objective harm requirement functions "as a constitutionally mandated limitation on" antiharassment laws, *id.* at 45, because "[a]nti-harassment measures cannot target 'pure speech,'" *Perlot v. Green,* 609 F. Supp.3d 1106, 1120 (D. Idaho 2022). In the absence of requiring some evidence of objective harm, rule 32:8.4(g) could veer toward the unconstitutional punishment of speech based solely on punishing disfavored viewpoints. *See Saxe,* 240 F.3d at 206 (" 'Where pure expression is involved,' anti-discrimination law 'steers into the territory of the First Amendment.' " (quoting *DeAngelis,* 51 F.3d at 596)); Eugene Volokh, *Freedom of Speech and Workplace Harassment,* 39 UCLA L. Rev. 1791, 1828 (1992) ("But at least some of the speech that harassment law suppresses is suppressed precisely because of its point of view; saying that women make bad policemen can give rise to liability, but saying that men and women should be treated equally cannot.").

The Indiana Supreme Court applied a similar objective harm standard in *In re Brown,* 703 N.E.2d 1041 (Ind. 1998) (per curiam). In that case, the court suspended an attorney's license for sexual harassment in the workplace. *Id.* at 1045. The court rejected the lawyer's "faulty premise" that he could not be punished if his conduct did not constitute sexual harassment as used in the employment law context. *Id.* at 1044. The court reasoned that "we do not need to satisfy . . . any other agency's legal definition of what constitutes 'sexual

harassment' to find that the respondent's creation and perpetuation of a work environment infected with inappropriate and unwelcome sexual advances violated" the rules of professional conduct. *Id.* The court reasoned that it "need only find that the ramifications of the respondent's acts" degraded the work atmosphere. *Id.* The court concluded that a violation was established and sanction was warranted because "the respondent's actions produced a work atmosphere tainted with anxiety and stress" and "[t]he evidence also reveal[ed] that some of his employees quit their jobs because of the respondent's advances." *Id.*

Requiring a showing of objective harm is not a new concept in sexual harassment law. For example, in the employment discrimination context, liability can be imposed on a defendant for a hostile work environment only where the expressive speech is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). Even in the employment law context, imposing liability in the absence of some objective assessment of the nonexpressive impact of the speech is in tension with and may violate the Supreme Court's First Amendment jurisprudence. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,* 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment."); *DeJohn,* 537 F.3d at 317–18 (stating regulation of protected speech violates the First Amendment "[a]bsent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work"); Caleb C. Wolanek, *Discriminatory Lawyers in A Discriminatory Bar: Rule 8.4(g) of the Model Rules of Professional Responsibility,*

40 Harv. J.L. & Pub. Pol'y 773, 782 (2017) ("By requiring severity or pervasiveness, Title VII is more about conduct than words.").

Our discussion of sexual harassment law in the employment context is meant only to illustrate the constitutional necessity of requiring an objective assessment of the nonexpressive impact of speech—beyond mere adverse emotional impact or subjective offense—as a prerequisite for disciplinary sanction. *See Gentile*, 501 U.S. at 1076 (affirming regulation of attorney speech as narrowly tailored because the rule "applies only to speech that is substantially likely to have a materially prejudicial effect" and that is "neutral as to points of view"). Our discussion is not meant to incorporate employment law standards into rule 32:8.4(g). We reiterate that sexual harassment in the workplace under rule 32:8.4(g) may be predicated upon conduct or speech "that may not give rise to civil liability" in the employment law context. *Newport*, 955 N.W.2d at 182. What constitutes " 'sexual harassment' in [our] attorney disciplinary cases is broader than the employment standard under Title VII." *Watkins*, 944 N.W.2d at 891; *see also Moothart*, 860 N.W.2d at 604 ("We have not required that the harassment be ongoing or pervasive as has been required in some employment contexts.").

Based on the foregoing, we cannot conclude that application of rule 32:8.4(g) in this case runs afoul of the Supreme Court's First Amendment jurisprudence. We have already concluded the board established by a convincing preponderance of the evidence that Neff violated rule 32:8.4(g). There is ample evidence, even on this stipulated record, that Neff's speech caused harm in the workplace when viewed from the vantage point of a reasonable person. His employees complained to him about his conduct, and Neff conceded that he had not always successfully addressed those complaints. He said the word "faggot" in a conversation with Yenna. After she objected to his use of the word and told him it offended her, he repeated the word to her face. *See Abrams*, 459 P.3d at

1239–41 (holding that use of the words "faggot" and "homo" were in violation of similar provision of Colorado's rules); *People v. Saxon*, 470 P.3d 927, 943 (Colo. O.P.D.J. 2016) (stating "abusive or harmful communication may be punished in a variety of contexts, both criminal and disciplinary"). In addition, Neff stipulated that two employees in his ten-employee office resigned their employment due, in part, to his conduct and statements. *Cf. In re Brown*, 703 N.E.2d at 1044. When Neff's conduct is viewed as a whole, there is sufficient objective harm to justify disciplinary action against him without running afoul of the Supreme Court's First Amendment jurisprudence.

## C.

We next address Neff's facial-overbreadth challenge. "An overbreadth challenge is unusual." *United States v. Hansen*, 599 U.S. 762, 769 (2023). Usually, "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.' " *Id.* (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *Id.* The Supreme Court has "justified this doctrine on the ground that it provides breathing room for free expression," explaining that "[o]verbroad laws 'may deter or "chill" ' constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.' " *Id.* at 769–70 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

To prevail on an overbreadth claim, the challenger to the rule must establish the rule " 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.' " *Id.* at 770 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)); *see Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) ("In the First Amendment context, however, we have

recognized 'a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010))). "[A] law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. "The showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.' " *Hicks*, 539 U.S. at 118–19 (citation omitted) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613–15 (1973)).

"To judge whether a [rule] is overbroad, we must first determine what it covers." *Hansen*, 599 U.S. at 770. With respect to regulating attorneys in the practice of law, the legitimate sweep of rule 32:8.4(g) is broad. The rule can be applied to sanction an attorney for nonexpressive conduct constituting sexual harassment because "nonexpressive conduct . . . does not implicate the First Amendment at all." *Id.* at 782; *see also DeJohn*, 537 F.3d at 316 ("[T]here is no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause . . . ."). For example, in *Steffes* we sanctioned an attorney who "took photographs of his partially-clothed client under the pretext of documenting her back injury" and who physically "pulled her shorts and underwear down to her knees, and then stepped back to take the pictures." 588 N.W.2d at 122, 123. In *Furlong*, we suspended an attorney's license for violating rule 32:8.4(g) when he "perpetually ogled" a client and "placed his hands on her back and shoulders." 625 N.W.2d at 712. In *Moothart*, we suspended an attorney for sexually harassing his clients and a female legal secretary where he convinced two clients to expose their breasts to him, kissed

a different client, and grabbed his secretary's breasts and looked up her skirt. 860 N.W.2d at 614.

Rule 32:8.4(g) can also be applied to quid pro quo sexual harassment, which also does not implicate the First Amendment. For example, a lawyer's statement " 'sleep with me or you're fired' may be proscribed not on the ground of any expressive idea that the statement communicates, but rather because it facilitates the threat of discriminatory conduct." *Saxe*, 240 F.3d at 208. "Despite the purely verbal quality of such a threat, it surely is no more 'speech' for First Amendment purposes than the robber's demand 'your money or your life.' " *Id.* Thus, in *Moothart* we had little trouble disciplining an attorney who subjected a client to explicit quid pro quo sexual harassment when he told her that the cost of his services would depend on how much cleavage the client exposed to him. 860 N.W.2d at 613. In *Newport*, we disciplined an attorney who proposed a quid pro quo sexual arrangement with his client—oral sex in exchange for legal services. 955 N.W.2d at 179.

Rule 32:8.4(g) can also be applied without constitutional concern to violations of the criminal law that also amount to sexual harassment within the meaning of the rule. In *Stansberry*, an attorney "stole a woman colleague's underpants from her home, rifled through and photographed her undergarments in her bedroom, and rifled through female colleagues' gym bags at the office to photograph their undergarments, all for his personal sexual gratification." 922 N.W.2d at 593. The attorney pleaded guilty to theft and criminal trespass. *Id.* at 594. We concluded that "taking photographs of their intimate items and stealing underpants for his own sexual gratification" violated rule 32:8.4(g). *Id.* at 597.

Finally, as discussed above, rule 32:8.4(g) can be applied in accord with the Supreme Court's First Amendment jurisprudence where the lawyer is being

sanctioned for causing harm in the practice of law beyond mere offense to the content of his speech.

Neff acknowledges the constitutional applications of rule 32:8.4(g) but argues the rule could also be applied to punish protected speech in violation of the First Amendment in some circumstances. We do not necessarily disagree with his contention, but that contention, standing alone, is not sufficient to establish rule 32:8.4(g) is facially overbroad. Neff was required to establish that rule 32:8.4(g)'s overbreadth is "*substantial . . .* relative to [its] plainly legitimate sweep." *Williams*, 553 U.S. at 292. He was required to show "from actual fact that a substantial number of instances exist in which the [rule] cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988).

Neff failed to meet that burden of proving his overbreadth challenge. Rule 32:8.4(g)'s prohibition of sexual harassment "has a wide legitimate reach insofar as it applies to nonexpressive conduct," unprotected speech, violations of the criminal law, and to speech causing harm beyond mere offense to the audience when viewed from the perspective of a reasonable person. *Hansen*, 599 U.S. at 784. Further, the rule only prohibits attorneys from engaging in sexual harassment and other unlawful discrimination "in the practice of law." Iowa R. of Prof'l Conduct 32:8.4(g). This limitation is significant because the rule does not at all encompass an attorney's conduct or speech outside the practice of law. Neff failed to show from actual fact that "the ratio of unlawful-to-lawful applications is . . . lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 784; *see, e.g., Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 358 (8th Cir. 2020) (affirming the dismissal of an overbreadth challenge to the university's sexual harassment policy and explaining the challenger failed to show a substantial number of enforcement actions would involve protected speech). Neff "has not identified, nor do we perceive, a broad swath of speech that would be impermissibly limited

by [rule 32:8.4(g)] such that the [r]ule risks chilling or penalizing protected speech." *In re Abrams,* 488 P.3d 1043, 1054 (Colo. 2021) (en banc).

D.

In Neff's briefing on his First Amendment challenge, he also mentions that rule 32:8.4(g) is unconstitutionally vague and thus void for vagueness. However, a vagueness challenge arises under the Due Process Clause of the Fourteenth Amendment to the United States Constitution or article I, section 9 of the Iowa Constitution. *See Formaro v. Polk County,* 773 N.W.2d 834, 840 (Iowa 2009). Neff failed to cite either of these constitutional provisions in his briefing, and he failed to meaningfully develop his vagueness challenge to rule 32:8.4(g). We conclude Neff forfeited his constitutional vagueness challenge to the rule. *See State v. Jackson,* ___ N.W.3d ___, ___, 2024 WL 1121676, at *9 (Iowa Mar. 26, 2024) ("A party forfeits an issue on appeal when the party fails to make more than a perfunctory argument in support of the issue.").

IV.

Finally, we address the appropriate sanction in this case. "There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Earley,* 729 N.W.2d 437, 443 (Iowa 2007). "We do, however, seek a degree of consistency in our disciplinary cases with respect to sanctions." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Taylor,* 814 N.W.2d 259, 268 (Iowa 2012). "In determining an appropriate sanction, we consider 'the nature of the violations, the need for deterrence, protection of the public, maintenance of the reputation of the Bar as a whole, and the violator's fitness to continue to practice law,' as well as any aggravating and mitigating circumstances." *Earley,* 729 N.W.2d at 443 (quoting *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Ramey,* 639 N.W.2d 243, 245 (Iowa 2002)).

The Board argues there are aggravating factors here that warrant a thirty-day suspension. The fact Neff was serving as a county attorney when the conduct occurred is an aggravating consideration. *See Watkins*, 944 N.W.2d at 892 ("Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of a lawyer." (quoting Iowa R. of Prof'l Conduct 32:8.4 cmt. [5])). There was also a power imbalance here, but not to the same degree as in *Watkins*, where the primary target of harassment was "a young, inexperienced legal assistant" and the respondent "abuse[d] his position of power and authority over his female employees to denigrate their positions and their very existence as women." *Id.* Finally, the effect of the harassment on Yenna and Schoemaker can be considered aggravating.

Neff argues that there are mitigating factors here and that a private admonition is the appropriate sanction. We agree there are mitigating factors present here. Neff has no prior disciplinary history. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Leitner*, 998 N.W.2d 627, 647 (Iowa 2023). He has cooperated in these proceedings. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Sobel*, 997 N.W.2d 421, 434 (Iowa 2023). He has dedicated himself to public service in the State of Iowa. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Bergmann*, 938 N.W.2d 16, 23 (Iowa 2020) (noting public service as a mitigating factor). Nonetheless, we cannot agree that a private admonition is the appropriate sanction.

This case differs from our prior cases in which we have suspended an attorney's license for violation of rule 32:8.4(g). This case does not involve sexual touching of clients that warranted suspension in our prior cases. In *Steffes*, the attorney "took photographs of his partially-clothed client under the pretext of documenting her back injury" and physically "pulled her shorts and underwear down to her knees, and then stepped back to take the pictures." 588 N.W.2d at

122, 123. In *Furlong*, the attorney gave one client "an uninvited kiss while they were at the courthouse during which he inserted his tongue into her mouth." *Id.* at 712. The attorney also ogled and touched another client. *Id.* In *Moothart*, the lawyer convinced clients to show him their breasts and had sexual contact with other clients. 860 N.W.2d at 618.

This case also does not involve quid pro quo sexual harassment of clients or explicit sexual advances toward employees. For example, in *Moothart*, the lawyer told his client that the cost of his services would depend on how much cleavage she exposed to him. *Id.* at 613. The same lawyer in *Moothart* also harassed his legal secretary, made explicit sexual comments directed to her about her body, asked her to perform a lap dance, grabbed her breasts, looked up her skirt, and commented on her underwear. *Id.* at 614. And, in *Newport*, the attorney requested oral sex in exchange for his legal services. 955 N.W.2d at 181.

This case does not involve criminal activity that also constituted sexual harassment as in *Stansberry*. In that case, "[t]he attorney stole a woman colleague's underpants from her home, rifled through and photographed her undergarments in her bedroom, and rifled through female colleagues' gym bags at the office to photograph their undergarments, all for his personal sexual gratification." 922 N.W.2d at 593. We concluded that suspension was warranted in that case.

This case is most similar to *Watkins*, but, as stated above, it is different in degree than *Watkins*. Watkins "ran the whole gamut" of put-downs, come-ons, and other sexually harassing conduct. *Watkins*, 944 N.W.2d at 888. Watkins made crude, graphic comments to his female staff about specific female clients, attorneys, and courthouse employees; showed naked pictures of his wife to female staff; asked an employee a crude question about her vagina; and made off-color sexual jokes in front of his female staff. *Id.* Watkins also appeared before a female employee wearing only his boxer briefs. *Id.* His conduct led to a formal

complaint before the county board of supervisors and an effort to remove him as county attorney. *Id.* at 886. In contrast, in this case, Neff made nine inappropriate statements. His comments, generally, were not targeted toward people in the office. No complaint has been lodged against him other than this ethics complaint. Most of the female employees in his office stand by Neff and view him favorably as a fair prosecutor and a good boss to work for.

On balance, we conclude that a public reprimand is the appropriate sanction for Neff's improper statements here. Neff should have realized that his statements were outside the bounds expected of Iowa lawyers. Membership in the bar is a privilege with conditions. *See Gentile*, 501 U.S. at 1062–63. One of those conditions is that an attorney conduct himself with professionalism in the workplace and not engage in conduct that constitutes sexual harassment, even if the conduct falls short of that creating civil liability in the employment law context. Neff failed to meet the standard of conduct required of Iowa lawyers, and we publicly reprimand him for his violation of rule 32:8.4(g).

**ATTORNEY REPRIMANDED.**

All justices concur except Christensen, C.J., and Mansfield, J., who take no part.